1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SCOTT ALAN FREEBURG,               )
                                   )
            Petitioner,            )        CASE NO.      C05-2014-JLR-MJB
                                   )
      v.                           )
                                   )
SANDRA CARTER,                     )        REPORT & RECOMMENDATION
                                   )
            Respondent             )
_____)

INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Scott Freeburg is a state prisoner who is currently incarcerated at the Clallam Bay
Corrections Center in Clallam Bay, Washington.  He seeks relief under 28 U.S.C. § 2254 from his
King County Superior Court convictions on charges of burglary in the first degree, assault in the
second degree, and murder in the first degree.  Respondent has filed an answer to the petition together
with relevant portions of the state court record.  Petitioner has filed a reply to respondent's answer.
The briefing is now complete and this matter is ripe for review.  Following careful consideration of the
record, this Court concludes that petitioner's § 2254 petition should be denied and that petitioner's
petition, and this action, should be dismissed with prejudice.

REPORT AND RECOMMENDATION
PAGE - 1

FACTUAL AND PROCEDURAL HISTORY

The Washington Court of Appeals, on direct appeal of petitioner's conviction, described the facts of petitioner's crime as follows[1]:

In the early morning hours of November 17, 1994, Freeburg entered the apartment shared by Jose Rodriguez and his girlfriend, Darlene Martinez, and shot and killed Rodriguez.

According to Martinez, she and Rodriguez were in bed when they heard someone pounding on the door. Rodriguez got out of bed. Martinez got up and followed him. Freeburg was at the door. He told Rodriguez that he had come to collect money owed to him by Martine Gomez who had lived at the apartment a few months earlier. Rodriguez told Freeburg he knew nothing of the debt but Freeburg demanded to come in and telephone Gomez.

Rodriguez and Martinez tried to prevent Freeburg from coming into the apartment. He forced his way in, brandishing a gun. When Martinez tried to call the police, Freeburg grabbed her, threw her on the couch, pointed the gun at her head, and told her to shut up or he would kill her. At this point, Rodriguez struck Freeburg on the head with an unknown object. While Freeburg and Rodriguez wrestled, Martinez headed for the door. As she was fleeing, Martinez heard one gunshot followed by a second one. She looked back and saw Rodriguez's body go limp.

Freeburg then opened the door and Martinez saw Freeburg's friend Lawrence Kuhn in the hall holding a gun. Freeburg told Kuhn to shoot Martinez if she moved. Freeburg went into the bedroom to look for money. Martinez rushed at Kuhn, knocked him into the wall and ran out of the apartment. Kuhn fired a shot at her, but missed. Freeburg and Kuhn then fled. Martinez banged on the door of another apartment. The occupant let Martinez in and they called 911. When they returned to

---

[1] Petitioner was originally tried and convicted in 1998, but that conviction was reversed by the Court of Appeals and the case was remanded for a new trial. *See State v. Freeburg*, 105 Wn. App. 492 (2001) This recitation of facts was set forth in the Court of Appeals' decision on petitioner's second direct appeal.

The Court notes that petitioner, in his response to respondent's answer, challenges the accuracy of some of the facts recited by the Court of Appeals. (*See* Dkt. No. 20 at 10.) While this Court concurs that there is at least one potential inaccuracy contained in the Court of Appeals' footnote four, none of the challenged facts affect this Court's resolution of the issues presented to it for review.

REPORT AND RECOMMENDATION
PAGE - 2

Martinez's apartment, Rodriguez was nearly dead on the couch.  Rodriguez later died from the second gunshot, which entered through the back of his neck.

Jeanette Stuker, who was with Freeburg and Kuhn on the night of the murder, was waiting in Freeburg's truck while he and Kuhn went into Rodriguez's apartment.  Stuker testified that she had taken drugs that evening and was in and out of consciousness while she waited in the truck.  She woke up when she heard screaming and the sound of two gun shots.  According to Stuker, when Freeburg and Kuhn returned, Freeburg was bleeding.  While they were driving away, Freeburg told Stuker that the guy in the apartment hit him with a lamp and Freeburg shot him.  She asked Freeburg if the guy he shot was dead and Freeburg said he didn't think so, because he shot him in the stomach.  Freeburg then said something to Stuker to the effect that he needed to leave the country.

Freda Kuhn testified that a day or two before the shooting, Freeburg and her nephew, Larry Kuhn visited her.[2]  She said that during that visit, Freeburg and Kuhn told her they were planning to steal money from a Mexican who had a large sum of money.  They also said they planned to steal drugs from him because he was selling drugs to children.

At trial, Freeburg admitted he shot Rodriguez, but claimed it was self defense.[3]  He denied there was a plan to rob Rodriguez.  According to Freeburg, he and Kuhn went to see Rodriguez about an automobile trade.  Rodriguez invited them into the apartment.  Kuhn and Rodriguez argued about money and drugs.  The argument escalated into a fight and Freeburg separated the two men.  Freeburg said that as he turned towards Kuhn, Rodriguez hit him in the back of the head with an unknown object, knocking him to his knees.  Freeburg looked up, saw Rodriguez pointing a gun at him at close range, and rushed at Rodriguez.  As the two wrestled, the gun fired once, and Freeburg then got control of it.  Rodriguez kneed Freeburg and grabbed his crotch.  Freeburg testified that he fired the gun without looking or thinking and Rodriguez fell to the couch.[4]  Kuhn grabbed the gun, and he and Freeburg left in Freeburg's truck.

---

[2] [Court of Appeals' footnote 2] Freda Kuhn testified at the first trial in 1998.  Because she was in a nursing home and not competent in the second trial, the transcript of her testimony was read to the jury.

[3] [Court of Appeals' footnote 3] Freeburg testified at the first trial.  In the second trial in 2002, his videotaped testimony from the first trial was played to the jury.

[4] [Court of Appeals' footnote 4] Freeburg's account of the shooting was undermined by the testimony of his medical expert who described the fatal shot to the back of Rodriguez's neck as "well-placed" and indicative of the shooter having "good control over the victim."  17RP 3027.

REPORT AND RECOMMENDATION
PAGE - 3

The day after the shooting, Freeburg went to work to arrange to have a co-worker deposit his paycheck.[5]  He spent the next four days traveling in northwest Washington.  On the fifth day, Freeburg signed on as a crew member for a boat sailing to Mexico.  Six months later, he sailed from Mexico to Canada.  In Canada he assumed a false identity, carried false identification, and changed his appearance.  In February 1997, he was arrested by Canadian authorities.

The State originally charged Freeburg with one count of first degree murder with a firearm.  The State later added one count of first degree burglary with a firearm and one count of second degree assault with a firearm.  Freeburg was convicted on all three counts and he appealed.  This court reversed and remanded for a new trial on the ground that it was prejudicial error to admit evidence that Freeburg possessed a weapon when he was arrested in Canada.[6]  Following the second trial in March 2002, Freeburg was again convicted on all three counts.  The trial court found he is a persistent offender and sentenced him to life in prison without the possibility of parole.  Freeburg appeals.

(Dkt. No. 11, Ex. 22 at 2-5.)

Petitioner, through counsel, appealed his conviction and sentence to the Washington Court of Appeals.  (*See id.*, Exs. 18 and 20.)  On February 17, 2004, the Court of Appeals issued an opinion in which it affirmed petitioner's convictions, but reversed and remanded the case for re-sentencing.  (*Id.*, Ex. 22.)  Petitioner filed a motion for reconsideration which was denied on February 5, 2004.  (*Id.*, Exs. 23 and 24.)

Petitioner next filed a petition for review in the Washington Supreme Court.  Petitioner, through counsel, presented the following eight issues to the Supreme Court for review: (1) petitioner's right to a fair trial was violated when deliberating jurors were subject to improper influences; (2) petitioner's right to a fair trial was violated when the trial court denied a jury request for access to videotape of petitioner's prior testimony; (3) petitioner's rights under the Confrontation Clause were

---

[5] [Court of Appeals' footnote 5] He never returned to his workplace and never accessed his bank account.

[6] [Court of Appeals' footnote 6] *Freeburg*, 105 Wn. App. at 492.

REPORT AND RECOMMENDATION
PAGE - 4

violated when the trial court erred in admitted Larry Kuhn's hearsay statement; (4) petitioner's rights under the Confrontation Clause were violated when the trial court limited the scope of cross-examination of the complaining witness; (5) petitioner's right to a fair trial was violated when the prosecutor made improper comments; (6) petitioner's right to a fair and impartial judge was violated; (7) petitioner's right to a fair trial was violated when the prosecutor failed to disclose agreements with State witnesses; and, (8) petitioner's right to a fair trial was violated when the State failed to preserve exculpatory evidence. (Dkt. No. 11, Ex. 26 at 1-3.) On November 3, 2004, the Washington Supreme Court denied petitioner's petition for review without comment. (*Id.*, Ex. 28.)

Petitioner's case was thereafter remanded to the King County Superior Court for re-sentencing. On February 17, 2005, petitioner was sentenced to a term of 471 months confinement, which included a 60-month term for deadly weapon enhancements. (*Id.*, Ex. 1.) Petitioner appealed his new sentence to the Washington Court of Appeals. (*See id.*, Ex. 30.) On August 14, 2006, the Court of Appeals issued an unpublished opinion in which it rejected most of petitioner's arguments, but concluded that the sentencing court did improperly impose deadly weapons enhancements totaling 60 months. (*Id.*, Ex. 34.) The Court of Appeals therefore once again remanded the matter to the King County Superior Court for re-sentencing. (*Id.*)

While petitioner's appeal from his February 2005 sentencing was pending, petitioner filed a personal restraint petition in the Washington Court of Appeals. (*Id.*, Ex. 35.) The Court of Appeals construed the petition as presenting the following challenges to petitioner's convictions: (1) petitioner's trial counsel was ineffective; (2) the charging document was defective; and, (3) the trial court's comments about the special verdict form improperly influenced the jury's verdict. (*Id.*, Ex. 36.) On December 16, 2005, the Acting Chief Judge of the Court of Appeals dismissed the petition on

REPORT AND RECOMMENDATION
PAGE - 5

the grounds that petitioner had presented only conclusory allegations unsupported by any facts, evidence, or meaningful legal analysis.  (Dkt. No. 11, Ex. 36.)

Petitioner filed a motion for discretionary review of the Court of Appeals' order dismissing his personal restraint petition, but that motion was dismissed by the Washington Supreme Court as untimely.  (*Id.*, Exs. 37 and 38.)  Petitioner now seeks federal habeas review of his convictions.

GROUNDS FOR RELIEF

Petitioner identifies four grounds for relief in his petition: (1) the prosecution violated petitioner's rights to due process and to a fair trial when it failed to disclose deals and agreements made with witnesses Jeanette Stuker and Darlene Martinez; (2) the prosecution violated petitioner's due process rights when it failed to preserve critical exculpatory evidence; (3) the prosecution violated petitioner's right to a fair trial when it knowingly presented false testimony, improperly vouched for the credibility of witnesses, improperly commented on petitioner's silence, and lied to the trial court; and, (4) the trial court violated petitioner's rights under the Confrontation Clause when it admitted a hearsay statement of Lawrence Kuhn through the testimony of Freda Kuhn.  (*See* Dkt. No. 1 at 5-6 and Attached Points and Authorities.)

DISCUSSION

Respondent concedes in her answer to the petition that petitioner has properly exhausted most of his claims, but she contends that petitioner failed to properly exhaust many of the allegations underlying his prosecutorial misconduct claim (Ground 3) because he failed to present those allegations to the Washington Supreme Court.  (Dkt. No. 8 at 6.)  Respondent further contends that both the exhausted and unexhausted claims presented in petitioner's first three grounds for relief are without merit.  (*Id.* at 9.)  As to petitioner's fourth ground for relief, respondent argues that petitioner

REPORT AND RECOMMENDATION
PAGE - 6

waived any objection to the admission of the non-testimonial statement of Lawrence Kuhn because the defense failed to object to its admission at trial.  (Dkt. No. 8 at 16.)  Finally, respondent argues that even if petitioner's fourth ground for relief is not barred from review, there was no Confrontation Clause violation.  (*Id*.)

Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act, a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was *contrary to*, or involved an *unreasonable application* of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d) (emphasis added).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Id*.  The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

Failure to Disclose Exculpatory Evidence

Petitioner asserts in his first ground for federal habeas relief that the prosecution violated his

REPORT AND RECOMMENDATION
PAGE - 7

rights to due process and to a fair trial when it failed to disclose deals and agreements made with prosecution witnesses Jeanette Stuker and Darlene Martinez.  (Dkt. No. 1 at 5.)

The Constitution requires that the prosecution disclose to an accused all evidence that is "both favorable to the accused and 'material either to guilt or to punishment.'"  *United States v. Bagley*, 473 U.S. 667, 674 (1985) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  The duty to disclose encompasses both exculpatory evidence and impeachment evidence.  *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *Bagley*, 473 U.S. at 676).   Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitely*, 514 U.S. 419, 433-34 (1995) (citing *Bagley*, 473 U.S. at 682). A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Kyles* , 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 678).

On direct appeal, petitioner argued that he was denied his right to due process when the prosecutor failed to disclose "deals" made with Jeanette Stuker and Darlene Martinez, as such evidence could have been used to impeach the testimony of these witnesses.  (Dkt. No. 11, Ex. 20 at 19.)  The Washington Court of Appeals rejected this claim because the record contained no evidence that any deals had been offered to Stuker or Martinez in exchange for their testimony.  (*Id.*, Ex. 22 at 27.)

Petitioner, in these proceedings, continues to insist that the prosecution made deals with Stuker and Martinez.  Petitioner notes that both Stuker and Martinez had outstanding arrest warrants in unrelated criminal matters during the pendency of petitioner's case, and yet neither was arrested. Petitioner also makes reference to Martinez's cooperation in a prior unrelated criminal case which spared her jail time, and to her proven lack of veracity in other matters.  Petitioner suggests that these

REPORT AND RECOMMENDATION
PAGE - 8

factors evidence, at the very least, unspoken deals offered by the police and prosecutors to these witnesses. This Court disagrees.

On direct examination, both witnesses denied that any promises or threats had been made to them in exchange for their cooperation or testimony. (*See* Dkt. No. 11, Ex. 6 at 2151; Ex. 7 at 2346-48.) Petitioner's counsel was able to explore the witnesses' subjective motivations for testifying through cross-examination. (*See id.*, Ex. 6 at 2146-51; Ex. 7 at 2387-93.) However, none of the testimony elicited by petitioner's counsel on this topic substantiated that any deals had been made with these witnesses and petitioner provides no independent evidence of any such deals. The Court of Appeals reasonably concluded that there was no evidence of any deals. And, in the absence of such evidence, petitioner's *Brady* claim must fail simply because there was no apparent agreement to disclose. Accordingly, petitioner's federal habeas petition should be denied with respect to his first ground for relief.

<u>Failure to Preserve Evidence</u>

Petitioner asserts in his second ground for relief that the prosecution violated his right to due process when it failed to preserve critical exculpatory evidence. (Dkt. No. 1 at 5.) Specifically, petitioner cites to a ring belonging to the victim, a $CO_2$ gun which was found in the victim's apartment but subsequently "vanished' from police custody, a tape of the initial interview of witness Jeanette Stuker, and a car title bearing defendant Stuker's signature. (*Id.*)

As noted above, a criminal defendant has a constitutionally protected right to request and obtain from the prosecution evidence which is material to the guilt of that individual. *See California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady*, 373 U.S. at 87.) In *Trombetta*, the United States Supreme Court stated, with respect to the preservation of evidence, "[w]hatever duty the

Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet the standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488-89 (footnote and citations omitted).  In *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."

On direct appeal, petitioner argued that he was denied exculpatory evidence by the prosecutor despite an order by the trial court that all such evidence be produced.  (*See* dkt. No. 11, Ex. 20 at 22-26.)  At issue are items that either were never taken into evidence by police, or were not retained by police.  The Court of Appeals rejected the claim, explaining as follows:

> Freeburg argues the State violated this order by failing to disclose a $CO_2$ gun found in Rodriguez's apartment after the shooting.  He argues that the $CO_2$ gun could have been the object Rodriguez used to hit Freeburg when the two were fighting. Detective O'Keefe testified that he examined the gun at the crime scene and, because he did not find any hair or blood on it, did not take it into evidence.  O'Keefe also testified that he searched the apartment and did not find any hard, sharp objects with blood or hair on them, but if he had found such objects, he would have taken then into evidence.  Because it does not appear from the record that the $CO_2$ gun was exculpatory evidence, the State did not violate its duty to disclose exculpatory evidence or deny Freeburg his right to present a defense.

> Freeburg next argues about a ring that belonged to Rodriguez.  Detective Gebo testified that Rodriguez's ring could have caused the cut on Freeburg but that he examined the ring with a magnifying glass and found no blood on it.  He did not send the ring to the lab for testing, and instead released it to Martinez.  Freeburg argues that, without the ring, he could not prove Rodriguez hit him and cut him with a weapon instead of with the ring.  But any error in not preserving the ring for testing was harmless in light of Gebo's testimony that he saw no blood or hair on the ring when he examined it under a magnifying glass.

REPORT AND RECOMMENDATION
PAGE - 10

Next, Freeburg argues the State destroyed evidence about car trading activities. But his written argument suggests that defense counsel, not the State, knew about this evidence. Also, there is nothing in the record to substantiate Freeburg's assertion that the investigating officers destroyed the title to a car owned by Stuker.

(Dkt. No. 11, Ex. 22 at 28-29.)

Petitioner makes no showing in these proceedings that the failure of the state to secure and preserve evidence violated his due process rights. As to the gun and the ring, petitioner fails to satisfy this Court that those pieces of evidence had any apparent exculpatory value. Moreover, petitioner provides absolutely no evidence that law enforcement acted in bad faith in failing to preserve for trial any of the pieces of evidence cited by petitioner in his petition. In the absence of such evidence, this Court must conclude that the decision of the Court of Appeals was both reasonable and consistent with federal law. Accordingly, petitioner's federal habeas petition should be denied with respect to his second ground for relief.

<u>Prosecutorial Misconduct</u>

Petitioner asserts in his third ground for federal habeas relief that the prosecutor violated his right to a fair trial when he knowingly provided false testimony and vouched for the truthfulness of witnesses Darlene Martinez and Jeanette Stuker. (Dkt. No. 1 at 6.) Petitioner also alleges that the prosecution improperly commented on his right to remain silent. (*Id.*) Finally, petitioner appears to contend that the prosecutor lied in a written statement presented to the trial court which stated that petitioner had committed two murders in Canada. (*Id.*) While respondent argues that many of petitioner's prosecutorial misconduct claims are unexhausted, the Court need not address the exhaustion argument as this Court concludes that none of petitioner's prosecutorial misconduct claims has merit. *See* § 28 U.S.C. § 2254(b)(2).

REPORT AND RECOMMENDATION
PAGE - 11

### 1.     *Knowing Use of Perjured Testimony*

It is well established that a conviction may not stand under the Fourteenth Amendment when a prosecutor either knowingly solicits false evidence or "although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1950).  Petitioner, however, makes no showing whatsoever that the prosecutor knowingly solicited any false testimony during the course of petitioner's trial.  The fact that Darlene Martinez admitted during her testimony that she had lied to authorities in the past (*see* Dkt. No.11, Ex. 6 at 2104-09) does not suffice to establish that she testified falsely in this instance, or that the prosecutor knowingly solicited any false testimony.  Likewise, the fact that the defense was able to produce at trial chronological notes maintained by the Washington Community Corrections Office indicating that Jeannette Stuker had told a Community Corrections Officer at some point that she was involved in a murder investigation and *may* get a plea bargain for her cooperation (*see id.*, Ex. 12 at 3279-81) does not establish that Stuker testified falsely when she testified that she had not, *in fact*, received any deals from the State in exchange for her cooperation.  Accordingly, petitioner's federal habeas petition should be denied with respect to this claim.

### 2.     *Vouching*

The Ninth Circuit has identified two situations in which improper vouching typically occurs: (1) the prosecutor places the prestige of the government behind a witness by expressing his personal belief in the veracity of the witness, or (2) the prosecutor indicates that information not presented to the jury supports a witness's testimony.  *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002) (citing *United States v. Edwards*, 154 F.3d 915, 921 (9th Cir. 1998)).  Improper vouching also

REPORT AND RECOMMENDATION
PAGE - 12

occurs when a prosecutor implicitly vouches for a witness's credibility.  *Hermanek*, 289 F.3d at 1098 (citing *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985)).

Petitioner appears to contend that the prosecutor improperly vouched for the credibility of Darlene Martinez merely be presenting her testimony at trial because he was aware that Martinez had previously lied to authorities.  Petitioner, however, offers no authority for the proposition that the mere presentation of a witness constitutes improper vouching.  And, as correctly asserted by respondent, petitioner fails to identify where in the record the prosecutor either implicitly or expressly vouched for the credibility of Martinez, or suggested in any way that Martinez's testimony was supported by information not presented to the jury.  Accordingly, petitioner's federal habeas petition should be denied with respect to this claim as well.

### 3.     *Right to Remain Silent*

In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the United States Supreme Court held that the "use for impeachment purposes of [a defendant's silence] at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment" because the warnings imply that the defendant will not be penalized for his silence.  However, a defendant's pre-arrest or pre-*Miranda* silence may be used for impeachment purposes without violating the federal constitution.  *See Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993) (citations omitted).  In addition, if a defendant gives a statement after receiving *Miranda* warnings, and that statement is arguably inconsistent with his trial court testimony, the prosecutor may inquire into the prior inconsistent statements during cross-examination of the defendant.  *See Anderson v. Charles*, 447 U.S. 404, 408-09 (1980).

REPORT AND RECOMMENDATION
PAGE - 13

On direct appeal, petitioner argued that the prosecutor impermissibly commented on his right to remain silent during closing arguments.  (Dkt. No. 11, Ex. 18 at 29-33.)  The Court of Appeals rejected that claim, explaining its decision as follows:

> Freeburg testified that two days after the shooting, his landlord told him that Sergeant Gebo was trying to contact him.  The landlord gave Freeburg Gebo's card and told Freeburg that Gebo would not be back at work until Monday.  When asked whether he ever called Gebo, Freeburg answered: "I wanted to, but, no, I did not."[7] Freeburg's testimony on cross examination was to the same effect, namely, that he knew Gebo was trying to get [sic] reach him, but that Freeburg never contacted him. Freeburg also testified that he likewise did not call anybody else at the Seattle Police Department and that, instead of calling Gebo on Monday, he left and sailed to Mexico.

> During closing argument, Freeburg argued his testimony and version of the events was more credible than the State's evidence.  In rebuttal, the State argued that the evidence did not support Freeburg's description of what happened in part because of the choices Freeburg had made.  The prosecutor argued:

>> Let's talk about the Defendant's choices very briefly.  He chose to be with Jeanette Stuker that night.  The heroin addict hooker, and now he complains, well, she's not really very reliable.
>> The Defendant chose to go to Darlene and Jose's apartment at one o'clock in the morning, and now he sort of complains that those are sort of shady people, with some kind of past, particularly Jose, the fact that he's an illegal or has other names.  I have no idea what bearing that has on this case, other than it's [sic] sort of gratuitously kind of kicks him around it, and maybe you'll care less about him as a result.  I don't know what it has to do with this case.
>> The Defendant chose to take the weapon from the apartment, and now want you folks to speculate about that weapon being somehow in the hands of the victim at some earlier point in time.  And that was a choice he made.
>> The Defendant chose not to talk to the police.  But he wants you to believe that he had this great story to tell.
>> [DEFENSE COUNSEL]: Your Honor, I would object.  It's commenting on the Defendant's right to remain silent.
>> [THE COURT]: Overruled.  You may continue your argument.  Objection noted.
>> [PROSECUTOR]:  He wants you to speculate about this great story that he had to tell, even though he fled.  And it's interesting isn't it?  Because

---

[7] [Court of Appeals' footnote 77] RP 03/25/02 at 65.

REPORT AND RECOMMENDATION
PAGE - 14

what got left?  Business cards, over at all these different places.  Business cards.
And the Defendant says, I was too afraid to talk to anybody.

Well, before you hop on a boat and go to Mexico, you know, you can
for a whole quarter, you can sit there and say, Detective Gebo, you know, this
[sic] Scott Freeburg.  And I'm not going to tell you where I am right now, but I
got a story to tell you.  And I'm afraid you won't believe it, but I'm going to
tell you anyway.  Let me tell you what really happened that night.  No.  And do
you know why?  Because this was his state of mind.  He hadn't cooked the
story up yet.  He was still stuck in the, oh, I made a terrible mistake –

[DEFENSE COUNSEL]:  Your Honor, I'm going to raise the
objection.  It's commenting on the Defendant's right to remain silent.

[THE COURT]:  Right.  Objection noted.  It's overruled.  You may
continue argument.

[PROSECUTOR]:  This is his state of mind.  He's still stuck on the, I
really did a bad thing.  Honey, don't hate me.  It couldn't be more clear.

What other choices did he make?  He made the choice to lie to his
girlfriend about his wound, and remained silent about this event, even though he
knew she'd learn the truth.  And he made the decision to flee the country for
the better part of three years.  But he wants you to speculate again about this
great story that he had to tell all along.

There's only one witness in this case that meaningfully, meaningfully,
supports a claim of self-defense, and that's the Defendant.  And that's a witness
that's not worthy of belief.  That's why the State put his testimony from '99 –
1998 before you.  It's important that you heard the version that he came up
with then, and we wanted you to hear that.

His claim of self-defense is betrayed by his words.  It's betrayed by his
deeds.  And it's betrayed by his own silence.

[DEFENSE COUNSEL]:  Objection, Your Honor.  The Defendant has
the right to remain silent.

[THE COURT]:  Yes.  And the jury has been so instructed.
. . .
[THE COURT]:  Objection's overruled.  You may continue argument.[8]

On appeal, Freeburg contends that the prosecutor's argument was an
impermissible comment on his right to remain silent.  A prosecutor may not make an
argument relating to a defendant's silence in order to infer guilt from such silence.[9]

---

[8] [Court of Appeals' footnote 78] 20RP 3678-81.

[9] [Court of Appeals' footnote 79] *State v. Easter*, 130 Wn.2d 228, 236, 922 P.2d 1285
(1996).

REPORT AND RECOMMENDATION
PAGE - 15

Included in this prohibition is the use of the defendant's prearrest silence to infer guilt.[10] But, "the Fifth Amendment is not violated when a defendant who testifies in his own defense is impeached with his prior silence."[11]

> [I]mpeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial.  We conclude that the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility.[12]

> Freeburg's testimony was essential to his defense of self defense and his closing argument.  The State's rebuttal argument related to Freeburg's failure to contact Detective Gebo was used to impeach his testimony and respond to his defense.  The prosecutor's comments were not an improper comment on Freeburg's right to remain silent.

(Dkt. No. 11, Ex. 22 at 23-25.)

Petitioner offers nothing in these proceedings to demonstrate that the decision of the Washington Court of Appeals was either contrary to, or constituted an unreasonable application of, federal law.  The record supports the conclusion that the prosecutor's comments regarding petitioner's silence were not impermissible comments on petitioner's right to remain silence because the comments related to, and arose out of, efforts of the prosecutor to impeach petitioner's own testimony.  Accordingly, petitioner's federal habeas petition should be denied with respect to this portion of his prosecutorial misconduct claim.[13]

---

[10] [Court of Appeals' footnote 80] *Id.*, 130 Wn.2d at 243.

[11] [Court of Appeals' footnote 81] *Jenkins v. Anderson*, 447 U.S. 231, 235, 100 S.Ct. 2124, 65 l.Ed.2d 86 (1980).

[12] [Court of Appeals' footnote 82] *Id.*, 447 U.S. at 238.

[13] Petitioner appears to indicate in his response to respondent's answer that he believes his claim involving the prosecutor's use of his pre-arrest silence is moot because he agreed to have his earlier taped and edited trial testimony presented to the second jury.  However, because it is unclear whether petitioner, in fact, intended to withdraw this claim, the Court has addressed the merits of the claim.

REPORT AND RECOMMENDATION
PAGE - 16

### 4.    *Prosecutor Statement re: Murders in Canada*

The final prosecutorial misconduct claim asserted by petitioner in his federal habeas petition is a claim that the prosecutor knowingly lied in a written statement to the trial court about petitioner having committed two murders in Canada.  Petitioner directs the Court's attention to the transcript of the first sentencing hearing following his second trial.  (*See* Dkt. No. 11, Ex. 15 at 3832.)  A review of the portion of the transcript cited by petitioner reveals that during petitioner's comments to the sentencing court prior to imposition of sentence, petitioner made reference to a report which was apparently submitted by a prosecutor in petitioner's first trial, in conjunction with a motion for extra security, which erroneously stated that petitioner had killed two people in Canada.   (Dkt. No. 11, Ex. 15 at 3831-32.)

Petitioner appears to be of the belief that security measures instituted as a result of misstatements made by the prosecutor to the trial court in petitioner's first trial somehow "polluted" his second trial.  (*See id*.)  Regardless, however, petitioner has not placed the conduct of the prosecutor at the trial under consideration in these proceedings at issue in this claim.  To the extent petitioner may take issue with security measures imposed at his second trial, such measures were within the discretion of the trial court and do not implicate the conduct of the prosecutor. Accordingly, petitioner's federal habeas petition should be denied with respect to this final portion of his prosecutorial misconduct claim.

<u>Confrontation Clause Violation</u>

Petitioner asserts in his final ground for relief that the trial court's admission of evidence of an out-of-court statement made by Larry Kuhn, through the videotaped testimony of Freda Kuhn, violated his rights under the Confrontation Clause.  (Dkt. No. 1 at 6.)  At issue is testimony of Ms.

REPORT AND RECOMMENDATION
PAGE - 17

Kuhn, which was presented at petitioner's first trial, about statements Mr. Kuhn made when he and petitioner were visiting Ms. Kuhn at her apartment prior to the shooting.  Ms. Kuhn's prior testimony was read to the jury at petitioner's second trial.  The relevant testimony was as follows:

> Q:  Okay.  Do you remember on the second occasion, you, Larry, and Scott having a discussion?
>
> A:  Yes, we talked about – I don't know, a lot of things, and then I knew they were getting down to what they wanted to say or something, and the next thing I heard was that they were planning to do something.
>
> Q:  What were they planning to do?
>
> A:  Well, they told me they had heard of a person who had just a [sic] received a very large amount of money and also drugs, and that this guy was selling the drugs to all the little children in the neighborhood and they thought they were going out there and not only take all his money, but get the drugs away from him, too.
>
> Q:  That's what Scott and Larry told you?
>
> A:  They were thinking about that, yeah, that they were thinking about that.
>
> Q:  Did they tell you where this drug dealer was from?
>
> A:  No, they just said he was Mexican.  And I said, what part of town does he live in, and they said south.

(Dkt. No. 11, Ex. 9 at 2736-37.)

Petitioner argued on direct appeal that the trial court erred in admitting the out-of-court statement of Mr. Kuhn through Ms. Kuhn's testimony under Washington Rule of Evidence ("ER") 801(d)(2)(v).  (*See id.*, Ex. 18 at 34.)  ER 801(d)(2)(v) provides that an out-of-court statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  Petitioner's contention on appeal was that the trial court had admitted the statement without finding that the statement furthered the

REPORT AND RECOMMENDATION
PAGE - 18

conspiracy. (Dkt. No. 11, Ex. 18 at 34.) Petitioner also argued, in his pro se brief on appeal, that the trial court erred in admitting Ms. Kuhn's testimony because Ms. Kuhn was not competent to testify at the first trial. (*See id*., Ex. 20 at 5-15.) Included in petitioner's argument that Ms. Kuhn was not competent to testify was a claim that the admission of Ms. Kuhn's testimony violated his rights under the Confrontation Clause. (*See id*., Ex. 20 at 13-15.)

The Court of Appeals, after considering petitioner's challenge to the admission of his co-conspirators's statement, concluded that petitioner had never challenged the admission of the statement under ER 801(d)(2)(v) in the trial court and that he could not raise this evidentiary issue for the first time on appeal. (Dkt. No. 11, Ex. 22 at 8-9, citing Washington Rule of Appellate Procedure 2.5(a).) The Court of Appeals also noted that "even if the argument had been presented below and the court found the evidence insufficient to show that Larry Kuhn's statements were made in furtherance of a conspiracy, any error in admitting the testimony would have been harmless because the statements were admissible as adoptive admissions under ER 801(d)(2)(ii)." (*Id*., Ex. 22 at 9 n. 26.) The state courts did not address any Confrontation Clause claim arising out of the admission of Mr. Kuhn's hearsay statement through the testimony of Ms. Kuhn.

Petitioner's Confrontation Clause claim is the only claim arising out of the admission of Ms. Kuhn's testimony which is before this Court for review. Respondent asserts that this claim is not subject to federal habeas review because petitioner's procedurally defaulted on the claim in the state courts. Respondent contends that the Court of Appeals' citation to RAP 2.5(a) in disposing of the claim on direct appeal constitutes an independent and adequate ground for disposition of the case and that petitioner is therefore procedurally barred from obtaining federal habeas review. Respondent argues, in the alternative, that even if petitioner did not waive this claim, there was no Confrontation

REPORT AND RECOMMENDATION
PAGE - 19

Clause violation.  Because this Court concludes that petitioner's Confrontation Clause claim lacks merit, the Court declines to address respondent's procedural bar argument.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI.  In *Ohio v. Roberts*, 448 U.S. 56 (1980), the United States Supreme Court held that the Confrontation Clause does not bar the admission of an out-of-court statement of an unavailable witness so long as the statement bears "adequate indicia of reliability." *Id*. at 66.  Under *Roberts*, an out-of-court statement meets the reliability test if it falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness*." Id.*

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court partially abrogated *Roberts*.  The Court, in *Crawford*, drew a distinction between testimonial and non-testimonial hearsay, and rejected the *Roberts* test as to testimonial hearsay statements.  As to testimonial hearsay statements, the Court held that such statements are barred under the Confrontation Clause unless the declarant is unavailable and the defendant had prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68-69.

The first question this Court must address in evaluating petitioner's Confrontation Clause claim is whether the statements at issue here were "testimonial" and therefore subject to the rule announced in *Crawford.*  The Supreme Court did not spell out a comprehensive definition of "testimonial" in *Crawford*, but did note that "testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id*. at 51.  The Court went on to distinguish "a formal statement to government officers" from "a casual remark to an acquaintance." *Id*.  The Court suggested that the former type of statement constitutes testimony whereas the latter does not.  The Court also noted that certain statements, such as business records or

REPORT AND RECOMMENDATION

PAGE - 20

statements in furtherance of a conspiracy, were not testimonial in nature. *Id*. at 56.

The statements made by Mr. Kuhn in the presence of his aunt, Ms. Kuhn cannot be deemed testimonial because of their casual nature. Accordingly, this Court turns to the question of whether the statements were properly admitted under the *Roberts* reliability test which remains applicable to non-testimonial statements. *See Crawford*, 541 U.S. at 68. As noted above, an out-of-court statement meets the reliability test if it falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66. Where evidence falls within a firmly rooted hearsay exception, reliability can be inferred. *Id*. The record suggests that Mr. Kuhn's statement was admissible under two firmly rooted exceptions to the hearsay rule, the co-conspirator exception and the adoptive admission exception. Accordingly, there was no Confrontation Clause violation and petitioner's federal habeas petition should therefore be denied with respect to his fourth ground for relief.

<u>CONCLUSION</u>

For the reasons set forth above, this Court recommends that petitioner's federal habeas petition be denied and that the petition and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

DATED this 21st day of March, 2007

MONICA J. BENTON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 21